UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

FIDELITY AND GUARANTY
INSURANCE COMPANY and SEDGWICK        NO. CIV. S-06-752 WBS GGH
CLAIMS MANAGEMENT SERVICES,

       Plaintiffs,

                         <u>MEMORANDUM OF DECISION</u>

   v.

GRETCHEN REDDY,

       Defendant.

----oo0oo----

      Plaintiffs Fidelity and Guaranty Insurance Company
("Fidelity") and Sedgwick Claims Management Services ("Sedgwick")
filed this action for declaratory relief regarding the proceeds
of an insurance policy.  Plaintiffs request the court to declare
that their handling of defendant Gretchen Reddy's claim did not
breach the implied covenant of good faith and fair dealing and
that the policy covering the insured, Wendy Delos Santos, remains
at the policy limit of $15,000 per person injured.  After a two-

1

day bench trial, the court finds that plaintiffs breached the implied covenant of good faith and fair dealing and will therefore deny the declaratory relief requested.  This memorandum constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

I.   <u>Findings of Fact</u>

The incident and injury giving rise to this dispute occurred on September 22, 2003 when Delos Santos, a permissive user of a car borrowed from Suburban Ford, was involved in an accident with defendant in Sacramento, California.  Because Delos Santos did not have personal insurance at the time of the accident, the only coverage she had was a policy that Fidelity had issued to Suburban Ford.  The policy covered permissive users of Suburban Ford's cars with limits of $15,000.00 per person and $30,000.00 per accident.

On October 1, 2003, defendant filed a claim with Sedgwick, the claims handling company that processed Fidelity's claims.  (Def.'s Ex. A at 13-16.)  Defendant's claim was assigned to Janet Burrows, the Senior Claims Manager in Sedgwick's Ford Daily Rentals department that handled claims for about twenty-six states, including California.  Thomas Adams, Burrows' Liability Supervisor, was responsible for overseeing the claim.  In supervising Burrows and eleven other claims handlers, Adams conducted reviews of the claim notes for each file on pre-determined intervals.  The depth of his review depended on the particular claim, but always included a review of the most current claim notes.  Adams, whose office door opened to the cubicles of the employees he supervised, also walked throughout

1   the office on a daily basis to confer with the employees.

2          When defendant filed her claim, Burrows had been
3   working for Sedgwick for about nine months.  While Burrows had no
4   experience working for an insurance company prior to joining
5   Sedgwick, she had about eighteen years of legal experience.  For
6   approximately eight years of those years, Burrows worked as a
7   paralegal in a plaintiffs' personal injury law firm and, among
8   other tasks, drafted motions for the litigation department.
9   Despite her lengthy legal experience, Burrows testified that,
10  before this lawsuit, she did not know that an insurer's bad faith
11  refusal to accept a reasonable settlement demand within policy
12  limits could render the insurer liable for a judgment against the
13  insured that exceeds the policy limits.[1]

14         At the time Burrows was assigned defendant's claim, she
15  had never paid the policy limit on a California claim or set a
16  reserve at the policy limit.  Of Burrows' approximately 180 to
17  190 active claims, only about sixty of her claims involved bodily
18  injury, only about thirty were based in California, and only
19  about ten had Suburban Ford as the primary insurer.  Because the
20  reserve was set at the policy limit and Suburban Ford was the
21  primary insurer for defendant's claim, defendant's claim was one
22  of the most, if not the most, significant of the claims assigned

23  _____

24         [1]   While Burrows did not work in California and had never
    handled a California insurance claim before coming to Sedgwick,
25  her state of employment, Michigan, "held long ago that an insurer
    is liable to its insured for a judgment exceeding policy limits
26  when the insurer, who has exclusive control of defending and
    settling the suit, refuses to settle within policy limits in 'bad
27  faith.'"  Commercial Union Ins. Co. v. Med. Protective Co., 426
    Mich. 109, 116 (1986) (citing City of Wakefield v. Globe Indem.
28  Co., 246 Mich. 645, 648 (1929)).

                                  3

1  to Borrows.

2         With respect to its employees' handling of claims,

3  Sedgwick's corporate standards at the time period relevant to

4  this case required employees to open all mail within twenty-four

5  hours, attach it to the file within three days, and respond to

6  any letters within ten days.  The corporate standards also

7  mandated that employees give letters from attorneys special

8  attention.  According to Adams, Sedgwick's employees received

9  "numerous training sessions" on these standards.  To implement

10 its standards, Sedgwick's mail was initially opened and date-

11 stamped by a mail clerk and then distributed to each employee's

12 box along with any faxes.  Burrows, who knew the corporate

13 standards for mail, checked her box several times per day and

14 "leafed through" her mail on the way back to her desk.  Beginning

15 at least in August of 2004, however, Burrows failed to comply

16 with Sedgwick's corporate standards and made a "conscious

17 decision" to set mail in a stack on her desk and ignore it until

18 she found the time to address it.

19        When defendant submitted her claim to Sedgwick on

20 October 1, 2003, Burrows interviewed defendant via telephone and

21 determined that defendant was an anesthesiologist who had been

22 unable to return to work since the accident.  (Def.'s Ex. A at

23 14-17.)  During their conversation, defendant also provided

24 Burrows with the contact information of a witness and police

25 officer who had told defendant that Delos Santos was at fault.

26 (Id.)  On November 5, 2003, defendant contacted Burrows to report

27 that she was continuing to incur medical bills and had not

28 returned to work.  (Id. at 9.)

1    For the following two-and-a-half months, it appears
2 nothing was done on the claim until January 20, 2004 when Burrows
3 contacted defendant to obtain an update on her condition, opened
4 a personal injury claim for defendant, and sent a letter to
5 defendant requesting releases to allow Sedgwick to obtain her
6 medical records.  (<u>Id.</u> at 44-48.)  When Burrows opened the
7 personal injury claim, she had already determined that Suburban
8 Ford was the primary insurer and knew that defendant had not
9 returned to work since the accident.  (<u>Id.</u>)  At that time,
10 Burrows increased the reserve to the policy limit of $15,000.00,
11 (<u>id.</u> at 49),[2] and planned to settle the claim once she obtained
12 the proper documentation.

13    One month later, Burrows sent defendant a second
14 written request for information detailing her medical expenses
15 and the medical release forms.  (<u>Id.</u> at 50.)  On February 29,
16 2004, Burrows received a letter indicating that Blue Shield of
17 California had a medical lien for expenses defendant incurred due
18 to the accident.  (<u>Id.</u> at 51-52.)  On April 6, 2004, Burrows sent
19 defendant a third request for her medical expenses and the
20 releases.  (<u>Id.</u> at 53.)  About one month later, Burrows received
21 the signed medical releases from defendant and then requested

22
23    [2]    The top line of the claim note lists "JBURROWS" as the
employee who entered the note; however, the closing line of the
note indicates: "**** NOTE CREATED BY: tadams ****."  (<u>Id.</u> at
24 49.)  At trial, the parties did not address whether Burrows or
Adams created the three claim notes that have this conflicting
25 designation.  (<u>Id.</u> at 49, 53, 75.)  Burrows, however, testified
to entering at least one of the claim notes that had this
26 designation and Adams testified only about entering claim notes
that have his name on the top line.  Therefore, the court finds
27 that Burrows made the claim notes that have her name as the
author on the top line, even when the closing line indicates that
28 Adams created the note.

1  defendant's medical records ten days later.  (<u>Id.</u> at 55-60.)
2  After receiving defendant's medical records, Burrows requested a
3  review of the records by Concentra, a third-party medical
4  reviewer.  (<u>Id.</u> at 65.)

5        On June 28, 2004, Burrows entered an "Action Plan"
6  claim note that indicated the tasks she planned to complete: "1.
7  Obtain and review medical records.  2. Evaluate claim.  3. Call
8  claimant and negotiate settlement.  4. Obtain signed release.  5.
9  Issue settlement check. [and] 6. Close file."  (<u>Id.</u> at 61.)  On
10 July 19, 2004, Adams entered a claim note stating that
11 defendant's medical records showed a back herniation and
12 concurring with Burrows' decision to set the reserve at
13 $15,000.00.  (<u>Id.</u> at 65.)  The following day, Burrows sent
14 defendant a letter informing her about the medical lien,
15 inquiring whether she intended to make a claim for lost wages and
16 out-of-pocket expenses, and requesting the requisite releases and
17 documentation.  (<u>Id.</u> at 66-67.)

18       Via facsimile on August 2, 2004, Burrows received the
19 independent review report from Concentra; however, Burrows did
20 not log her receipt of the review or its findings into the claim
21 notes until September 5, 2004.  (Def.'s Ex. O; Def.'s Ex. A at
22 71.)  The report concluded that the accident probably "caused a
23 temporary exacerbation of [defendant's] unresolved pre-existing
24 low back condition which required a course of treatment an[d] a
25 period of temporary total disability."  (Def.'s Ex. O at 5.)

26       On August 11, 2004, Burrows received a letter from
27 Michael M. Shea stating that he had begun representing defendant
28 on August 5, 2004.  (Def.'s Ex. A at 68-69.)  That same day,

Burrows sent a letter to Shea confirming receipt of his letter, inquiring whether defendant intended to make a claim for lost wages and out-of-pocket expenses, requesting documentation for any such claims, and informing Shea of the medical lien. (Id. at 69-70.)  At the close of her letter, Burrows stated:  "Upon receipt of this letter, please forward your theory of liability and your client's settlement demand, so we can expedite settlement of this case.  Please be advised our client's liability limits are 15/30."[3]  (Id. at 70.)  After sending this letter, Burrows expected to receive a settlement demand.

On September 1, 2004, Shea sent Burrows a letter that stated: "Please be advised that we are gathering [defendant's] medical records, billings, and wage loss information, and will forward that information to you in the near future." (Def.'s Ex. E.)  Burrows entered this letter into the claim notes on September 13, 2004.  (Def.'s Ex. A at 74.)  On September 16, 2004, Burrows entered an "Action Plan" indicating that "[w]e are waiting for the rest of [defendant's] specials and settlement demand."  (Id.)  The Action Plan also stated that Burrows intended to settle the claim once she received the information regarding defendant's wage loss and out-of-pocket expenses and her settlement demand.

On September 24, 2004, Shea sent Burrows an offer to

---

[3]   While the limits of Suburban Ford's policy at issue in this case are $15,000.00 per person and $30,000.00 per accident, Suburban Ford has separate coverage, with a limit of $10,000,000.00, for any direct liability claims.  (Pls.' Ex. 34.)  For reasons the court can only speculate, defendant chose not to argue that Burrows' statement regarding Suburban Ford's policy limits constituted bad faith.

1    settle defendant's claim at the policy limit of $15,000.00.

2    (Def.'s Ex. F.)   The first sentence of the two-page letter

3    stated:   "Please accept this as a settlement demand on behalf of

4    [defendant]."   (<u>Id.</u>)   Attached to the letter were twenty-seven

5    pages of copied documents that addressed defendant's wage loss

6    and out-of-pocket expenses.   (<u>Id.</u>)   The closing sentence of the

7    letter stated: "<u>This demand will expire of its own accord and</u>

8    <u>without further notice on October 21, 2004.</u>"   (<u>Id.</u>)

9         Sedgwick received defendant's settlement demand on

10   September 29, 2004, but Burrows did not log it into the claim

11   notes at that time.   Burrows does not remember when she read the

12   letter; however, when she leafed through her mail the day the

13   demand arrived at Sedgwick, she saw the first page of the

14   settlement demand and was aware that it was from Shea.   Because

15   Burrows was expecting to receive a settlement demand from Shea

16   and leafed through the letter and supporting documents when she

17   received it--which almost certainly would include noticing the

18   words "settlement demand" in the first sentence--the court finds

19   that Burrows knew the letter and attached documents contained a

20   settlement demand within the policy limits.[4]   Once she received

21

22        [4]   While Burrows did not testify that she read the second
     page that indicated the amount of the demand, the court finds
23   that Burrows had to know that the demand was within the policy
     limits because it is more likely than not that she read the
24   second page of the settlement demand.   Specifically, her October
     25, 2004, discussed <u>infra</u>, conclusion that the "economic damages
25   alone are more than the [policy limit]" could have derived from
     only two sources: 1) the second page of the letter that states
26   defendant's lost wages totaled $120,000.00; or 2) the twenty-
     seven pages of supporting documents accompanying defendant's
27   demand letter. (Def.'s Ex. A at 75; Ex. F.)   Based on her cursory
     approach to defendant's settlement demand, it is more likely
28   Burrows obtained this information from the simplest and shortest

the letter, Burrows believed she had all the information she
needed to settle the claim.

During the time between Sedgwick's receipt of
defendant's settlement demand and its expiration, two notes were
entered into the claim notes.  On October 3, 2004, Burrows
entered her receipt of information about the medical lien, which
she had actually received on August 18, 2004.  (Def.'s Ex. A at
74.)  On October 19, 2004, Adams conducted a 270-Day File Review
and concurred with Burrows' decision to set the reserve at the
policy limit.  (<u>Id.</u> at 75.)  At the time he conducted this
review, Adams was not aware of defendant's settlement demand.  On
October 21, 2004, defendant's settlement offer expired per its
terms.

The next entry occurred on October 25, 2004 in which
Burrows wrote: "We received medical and other specials, and the
economic damages alone are more than the [policy limit]."  (<u>Id.</u>
at 75.) Based on this entry, Burrows conceded that she had to
have read defendant's settlement demand and the information
accompanying it before October 25, 2004 because the attachments
to the settlement demand were the only documents from which she
could have obtained the information in her October 25th claim
note.  (Def.'s Ex. F; <u>see also</u> <u>supra</u> n.4.)

---

source (i.e., the single sentence on the second page of the
demand, not the twenty-seven pages attached to it).
Additionally, when Burrows received a settlement demand on her
most significant claim, it is hard to fathom that she was not
curious as to the amount of the demand and did not flip to the
second page to satisfy that curiosity.  Nonetheless, even if
Burrows did not look at the second page before the settlement
demand expired, the court still finds that she had to assume the
demand was within the policy limits because she had informed Shea
of the policy limits and knew he sent the demand.

1    Despite the fact that Burrows had knowledge of
2   defendant's settlement demand upon receipt of it on September 29,
3   2004 and had reviewed it in its entirety before October 25, 2004,
4   Burrows faxed two letters to Shea on November 1, 2004 that
5   feigned as if the settlement demand did not exist.  Burrows'
6   first fax had one sentence: "Please advise when we can expect to
7   received [sic] [defendant's] additional specials and settlement
8   demand." (Def.'s Ex. G.)  In her second fax, sent eight minutes
9   after the first, Burrows attached a copy of the medical lien.
10  (Def.'s Ex. H.)
11    Two days later, Burrows entered defendant's September
12  24, 2004 settlement demand into the claim notes.  In doing so,
13  she entered, verbatim, the content of defendant's settlement
14  demand letter except for the last sentence establishing the
15  deadline.  (Def.'s Ex. A at 76-77.)  Nineteen minutes after
16  entering the letter and supporting documentation into the claim
17  notes, Burrows recommended settlement at the policy limits and,
18  twelve minutes later, requested permission to do so, which Adams
19  subsequently granted.  (Id. at 78-79.)
20    In response to Burrows' November 1, 2004 faxes, Shea
21  mailed a letter to Burrows indicating that defendant's demand had
22  expired on October 21, 2004.  (Def.'s Ex. I.)  While Burrows did
23  not enter this letter into the claim notes, it prompted her to
24  discuss the claim with Adams and send Shea a letter on November
25  4, 2004 that purported to accept defendant's $15,000.00
26  settlement demand.  (Def.'s Ex. A at 79-82; Def.'s Exs. I, J.)
27  With her November 4, 2004 letter, Burrows included a settlement
28  agreement that required defendant and her husband to release

10

Delos Santos, Suburban Ford, and Sedgwick from all liability for the accident, including the medical lien.[5]  (Def.'s Ex. J.)

Defendant and her husband did not sign this agreement and, on November 10, 2004, Shea sent a second settlement demand for $500,000.00.  (Def.'s Ex. K.)  In response, and with the aid of counsel, Burrows sent Shea a letter on December 3, 2004 refuting that Sedgwick had handled the claim in bad faith and explaining that, "for the month of October and the beginning of November 2004, [Burrows] was called away on several occasions for family medical emergencies."  (Def.'s Ex. L.)  The letter offered to settle defendant's claim for the policy limit of $15,000.00.  (Id.)

At trial, Burrows explained that the "family medical emergencies" referenced in her December 3 letter involved her daughter's high-risk pregnancy due to the fact her daughter has Marfan Syndrome, a genetic tissue disorder.  Although Burrows could not provide specific dates or details, she explained that she had to leave work to attend numerous appointments with her daughter and "had her attention diverted."  During this time, Burrows nonetheless did not take any time off work and worked evenings and Saturdays to make up any time she missed.

On January 25, 2005, defendant initiated an action in state court against Delos Santos and Suburban Ford based on her

---

[5]  The parties stipulated that, if Shea and defendant were called as witnesses, they would testify that defendant's claim would have settled according to the terms in the settlement agreement that accompanied Burrows' November 4 letter if Burrows had sent the letter and settlement agreement before October 21, 2004.  (Stipulated Trial Test. of Shea; Stipulated Trial Test. of Reddy.)

11

1  injuries resulting from the September 22 accident.  Over a year

2  later, plaintiffs initiated this action for a declaratory

3  judgment establishing that, because plaintiffs handled

4  defendant's claim in good faith, the policy limits remain at

5  $15,000.00 per person injured.  The court held a two-day bench

6  trial and, for the reasons explained in this memorandum, will

7  deny plaintiffs' request for a declaratory judgment.

8  II.  <u>Applicable Law</u>

9        "The implied covenant of good faith and fair dealing

10 imposes a duty on an insurer to accept a reasonable offer to

11 settle a claim against its insured."  <u>Archdale v. Am. Int'l</u>

12 <u>Specialty Lines Ins. Co.</u>, 154 Cal. App. 4th 449, 464 (2007).  An

13 insurer breaches that duty, and may be liable for the entire

14 judgment against the insured, if it rejects a reasonable offer of

15 settlement that is within the policy limits.  <u>Critz v. Farmers</u>

16 <u>Ins. Group</u>, 230 Cal. App. 2d 788, 793 (1964), <u>overruled on other</u>

17 <u>grounds by</u> <u>Crisci v. Sec. Ins. Co. of New Haven, Conn.</u>, 66 Cal.

18 2d 425, 430 (1967).

19       Conduct that constitutes "'good faith' or 'bad faith'

20 on an insurer's part has not yet proved susceptible to pat legal

21 definition."  <u>Allen v. Allstate Ins. Co.</u>, 656 F.2d 487, 489 (9th

22 Cir. 1981); <u>see also</u> <u>Walbrook Ins. Co. v. Liberty Mut. Ins. Co.</u>,

23 5 Cal. App. 4th 1445, 1455 (1992) ("[B]ad faith is . . .

24 recognized as an 'amorphous concept' which 'necessarily varies

25 with the context' and thus has 'no generally accepted "correct"

26 definition.'") (citations omitted).  Consequently, instead of

27 applying a precise test to determine whether an insurer acted in

28 bad faith, and thereby breached the covenant, the trier of fact

12

must "undertak[e] a wide-ranging inquiry into such intangibles as motive, knowledge, experience, and the ability to prophesy." Walbrook Ins. Co., 5 Cal. App. 4th at 1456; see also id. ("[T]he litmus of good faith/bad faith is to be tested against the background of the totality of the circumstances in which the insurer's disputed actions occurred."); Crisci, 66 Cal. 2d at 429 ("In determining whether an insurer has given consideration to the interests of the insured, the test is whether a prudent insurer without policy limits would have accepted the settlement offer.").

In this inquiry, the trier of fact should consider:

> [T]he strength of the injured claimant's case on the issues of liability and damages; attempts by the insurer to induce the insured to contribute to a settlement; failure of the insurer to properly investigate the circumstances so as to ascertain the evidence against the insured; the insurer's rejection of advice of its own attorney or agent; failure of the insurer to inform the insured of a compromise offer; the amount of financial risk to which each party is exposed in the event of a refusal to settle; the fault of the insured in inducing the insurer's rejection of the compromise offer by misleading it as to the facts; and any other factors tending to establish or negate bad faith on the part of the insurer.

Brown v. Guarantee Ins. Co., 155 Cal. App. 2d 679, 689 (1957) (emphasis added); see also Walbrook Ins. Co., 5 Cal. App. 4th at 1456 ("The relative weight of these factors--which are nebulous and imprecise by their very nature--will, of course, vary from case to case."); see also Critz, 230 Cal. App. 2d at 797 ("Certainly, the extent of negotiations preceding the breakdown, the timing of the insurer's rejection in relationship to the sequence of accident, commencement of suit and trial are elements in the fact trier's individualized adjudication of good or bad

1  faith.") (citation omitted).

2      Under the current standard, "[l]iability based on bad
3  faith does not require a showing of dishonesty, fraud or
4  concealment." <u>Coe v. State Farm Mut. Auto. Ins. Co.</u>, 66 Cal.
5  App. 3d 981, 989 (1977) (citation omitted).  At the same time,
6  however, "the duty to exercise good faith is not commensurate
7  with the duty to exercise the care of an ordinarily prudent
8  person under the same circumstances.  Bad faith and negligence
9  are not legally synonymous." <u>Davy v. Pub. Nat'l Ins. Co.</u>, 181
10  Cal. App. 2d 387, 395 (1960) (citation omitted); <u>see also</u> <u>Aceves</u>
11  <u>v. Allstate Ins. Co.</u>, 68 F.3d 1160, 1167 (9th Cir. 1995) ("In
12  California, mere negligence is not enough to constitute
13  unreasonable behavior for the purpose of establishing a breach of
14  the implied covenant of good faith and fair dealing in an
15  insurance case.").

16      While negligence alone is not sufficient to constitute
17  bad faith, an insurer still has "'the duty to give intelligent
18  consideration to an offer of settlement, with reasonable
19  investigation and a decision by persons reasonably qualified to
20  decide upon the risks involved.'" <u>Walbrook Ins. Co.</u>, 5 Cal. App.
21  4th at 1457 (citation omitted).

22  III. <u>Conclusions of Law</u>

23      A.   <u>Defendant's Settlement Demand Was Reasonable</u>

24      Defendant's imposition of a twenty-seven-day deadline
25  (twenty-two days once received) in which plaintiffs could accept
26  defendant's settlement offer was reasonable.  <u>See</u> <u>Critz</u>, 230 Cal.
27  App. 2d at 798 ("[The injured party] had a right to attach a time

28

14

1   limit to her offer, but the insurer was not bound by it.").[6]   At

2   the time it received defendant's settlement demand, plaintiffs

3   had already investigated defendant's claim, set the reserve at

4   the $15,000.00 policy limit, indicated an intent to settle, and,

5   according to Burrows, believed that the settlement demand

6   provided all the information needed to settle the claim.   Once

7   Burrows entered the settlement demand into the claim notes, it

8   took her no more than nineteen minutes to recommend that Sedgwick

9   accept the offer and only twelve more minutes to request

10  authority to do so.   Under these circumstances, twenty-two days

11  to consider the settlement demand was clearly a reasonable amount

12  of time.   See id. (one-week limitation to consider a settlement

13  offer was not unreasonable); Kelley v. British Commercial Ins.

14  Co., 221 Cal. App. 2d 554, 561 (1963) (less than a day to

15  consider a settlement offer was reasonable when the insurer had

16  knowledge of the relevant facts).

17        Plaintiffs argued that defendant's settlement demand

18  was also unreasonable because it 1) did not include defendant's

19  
_____

20        [6]   Had plaintiffs contacted defendant before the deadline
    and requested more time for a legitimate reason, defendant's
21  refusal to extend the deadline may have been unreasonable.   See
    id. ("Had the company needed more time for investigation, for a
22  good faith assessment of the claim's value or for consultation
    with its policyholder, it might have chosen neither to accept nor
23  reject her offer, but rather to suggest additional time.").
    Plaintiffs did not, however, contact defendant before the
24  deadline.
        Plaintiffs' belated offer to settle the claim at the
25  policy limit shortly after the settlement demand expired does not
    negate their prior bad faith.   See id. at 796-98 ("The injured
26  party, however, is under no duty to keep negotiations open after
    rejection of an early settlement offer. . . . Even if the insurer
27  attempts to resume negotiations by a belated offer of the policy
    limit, that action does not necessarily relieve it of the onus of
28  an earlier bad faith rejection.") (citation omitted).

husband or all potentially-liable defendants and 2) did not

resolve all claims or mention the medical lien.  Upon receipt of

an allegedly insufficient settlement offer, however, plaintiffs

had the duty to respond and identify "any deficiency in the

offer's scope."  <u>Allen v. Allstate Ins. Co.</u>, 656 F.2d 487, 490

(9th Cir. 1981) ("[California law] does not require claimants

against insureds to begin settlement overtures with

letter-perfect offers to which insurers need only respond 'Yes'

or 'No.'  An insurer's duty of good faith would be trifling if it

did not require an insurer to explore the details of a settlement

offer that could prove extremely beneficial to its insured.");

<u>see also</u> <u>Saelee v. Progressive Classic Ins. Co.</u>, No. 07-2648,

2007 WL 120000, at *1 (E.D. Cal. Jan. 11, 2007) ("[The] duty to

communicate may be triggered by something less than a formal

offer.") (citation omitted).  Without having made such an effort,

plaintiffs "cannot now in good conscience use [their] own failure

to explore the settlement offer as a defense of [their] own

breach of duty to tender the policy limits."  <u>Betts v. Allstate</u>

<u>Ins. Co.</u>, 154 Cal. App. 3d 688, 708 n.7 (1984).

      B.   <u>Plaintiffs' Breached the Implied Covenant of Good Faith</u>
           <u>and Fair Dealing</u>

Plaintiffs ask the court to turn a blind eye to the

evidence in this case and find that Burrows' conduct was nothing

more than an "innocent mistake."  Far from conduct constituting

mere negligence or an innocent mistake, however, Burrows made a

conscious decision to delay responding to defendant's settlement

demand with the knowledge that her delay could detrimentally

affect the insured.

1    Asking the court to believe that Burrows, a former
2    paralegal in a plaintiffs' personal injury law firm, did not know
3    the significance of placing a settlement demand on a back-burner
4    simply stretches credulity too far.  Even assuming she managed to
5    work as a paralegal drafting motions for a personal injury law
6    firm without knowing that the failure to accept a reasonable
7    offer within the policy limits could expose the insurer to
8    liability in excess of the policy limits, Burrows had to know
9    that failing to settle a claim would subject the insured to
10   unlimited liability.  Burrows' approach to the deadline--
11   pretending that she had not received the settlement demand when
12   she faxed Shea and omitting only the sentence establishing the
13   deadline when she typed the letter into the claim notes--further
14   suggests that she knew the consequences of her delay.  Against
15   this backdrop of inevitable knowledge and suspicious conduct, the
16   court finds that Burrows made an intentional decision to ignore
17   the settlement demand with a conscious disregard for her duty to
18   protect her insured from needlessly facing unlimited personal
19   liability.[7]

20   _____

21      [7]   The court recognizes that most of the cases addressing
22   an insurer's conscious disregard for the rights of the insured
     appear in the context of an insured's ability to recover punitive
     damages from an insurer.  See, e.g., Delgado v. Heritage Life
23   Ins. Co., 157 Cal. App. 3d 262, 276 (1984) ("In order to justify
     an award of punitive damages the plaintiff must establish that
24   beyond the insurer's bad faith breach of an insurance contract,
     it acted 'with the intent to vex, injure or annoy, or with a
25   conscious disregard of the plaintiff's rights.'").  Still, the
     insurer's conscious disregard for the insured's rights is
26   indicative of bad faith because the showing required for the
     court to award punitive damages is greater than the showing
27   required to find bad faith.  See Hergenroeder v. Travelers Prop.
     Cas. Ins. Co., No. 06-1232, 2008 WL 1805786, at *26 (E.D. Cal.
28   Apr. 21, 2008) ("'In order to establish that an insurer's conduct

                                17

Even if the court believed that Burrows did not know the consequences of her delay, it would still find that plaintiffs breached the covenant of good faith and fair dealing. When determining whether to settle a claim, the insurer "must give at least as much consideration to the welfare of its insured as it gives to its own interests." <u>Egan v. Mutual of Omaha Ins. Co.</u>, 24 Cal.3d 809, 818 (1979). The insurer's duty of good faith also requires it to give "'<u>intelligent consideration</u> to an offer of settlement . . . by persons <u>reasonably qualified to decide upon the risks involved</u>.'" <u>Walbrook Ins. Co. v. Liberty Mutual Ins. Co.</u>, 5 Cal. App. 4th 1445, 1457 (1992) (citation omitted) (emphasis added). When, as in this case, failing to timely accept a reasonable settlement demand can expose the insured to unlimited personal liability, a claims handler who is oblivious to the risk that delay causes cannot be "reasonably qualified to decide upon the risks involved." <u>Id.</u> At a minimum, therefore, an insurer cannot purport to satisfy its duty unless its employees making crucial decisions are privy to such a fundamental rule of insurance law that dictates direct consequences for the insured based on the employees' conduct.

---

has gone sufficiently beyond mere bad faith to warrant a punitive award, it must be shown by clear and convincing evidence that the insurer has acted maliciously, oppressively or fraudulently.'") (citation omitted); <u>Yang v. Peoples Benefit Ins. Co.</u>, No. 06-458, 2007 WL 1555749, at *15 (E.D. Cal. May 25, 2007) ("'[A]n insurer's bad faith may not only breach the implied covenant of good faith and fair dealing, but also can be treated for tort purposes as a basis for exemplary damages where it occurs in a context of malice, fraud, or oppression.'") (citations omitted); <u>Miller v. Elite Ins. Co.</u>, 100 Cal. App. 3d 739, 758 (1980) ("In breach of good faith insurance cases, oppression has been defined as a conscious disregard of the insured's rights by the insurer.") (citation omitted).

1    In this case, the delay Burrows demonstrated was not
2  anomalous conduct that plaintiffs negligently allowed to slip
3  through the supervisory cracks.  On the contrary, the evidence
4  revealed that Adams was aware of Burrows' dilatory claims
5  handling and did nothing.  During his daily interaction with the
6  employees he supervised, Adams had to have seen the stack of mail
7  accumulating on Burrows' desk and, upon seeing mail in the stack
8  remain for extended periods, was at least aware that Burrows was
9  not following Sedgwick's policy of opening all mail within
10 twenty-four hours and attaching it to each file within three
11 days.  Adams also knew about Burrows' delay on defendant's claim
12 based on his 270-Day File Review because the entry immediately
13 preceding his review indicated that Burrows entered her receipt
14 of the Concentra report almost two months after she actually
15 received it.  Despite his awareness of Burrows' delay, Adams did
16 nothing.

17    At trial, not only did Adams refuse to acknowledge that
18 Burrows improperly handled defendant's claim, but he testified
19 that "it was handled actually very well."  In the face of
20 questions about the extended delays between Burrows receiving a
21 letter and logging it into the claim notes, Adams stated that
22 Burrows "was always on top of all the communication that came in
23 the office," was "the most organized person in the office," and
24 "looked at, read, and acted upon" "every single piece of mail."
25 Based on Adams' inaction in response to Burrows' delay and his
26 testimony and demonstrated attitude at trial, the court finds
27 that plaintiffs condoned Burrows' brand of dilatory handling of
28

her claims as a matter of practice.[8]

The way defendant's claim was handled in this case runs afoul of the insurer's duty of good faith and fair dealing, as well as California's insurance regulations[9] and every reasonable practice in conducting a business, including Sedgwick's own claims handling standards.  Most notably, in the context of claims submitted by the insured, the covenant of good faith and fair dealing "imposes upon the insurer the duty to act promptly on claims and to refrain from unreasonably withholding payment." Lee v. Crusader Ins. Co., 49 Cal. App. 4th 1750, 1757 (1996). The court can see no reason why the duty to act promptly on a claim submitted by the insured does not extend to a claim submitted against the insured, especially because the latter

---

[8]     In many cases, bad faith is clear because the court can readily identify that the insurer was acting in its own self-interest.  Here, the court can only speculate as to why plaintiffs condoned dilatory claims handling that disregarded the interests of its insureds.  Finding that the insurer acted in self-interest, however, is not a prerequisite to finding bad faith, nor should it be as the motivations behind a company's practices cannot always be definitively proven.  See Walbrook Ins. Co., 5 Cal. App. 4th at 1458 (insurer did not act in bad faith because its "primary motivation was neither bad faith nor its own interests"); Miller v. Elite Ins. Co., 100 Cal. App. 3d 739, 759 (1980) ("Bad faith failure to settle need not be based on dishonesty, fraud or concealment but may be based on an unwarranted refusal to meet the duty to accept reasonable settlements.") (citation omitted); Davy v. Pub. Nat'l Ins. Co., 181 Cal. App. 2d 387, 397 (1960) ("A determination respecting the presence or absence of good faith involves an inquiry into motive, intent and state of mind.  Conclusions concerning such matters, in most cases, are founded upon inferences.").

[9]     For example, California's insurance regulations provide: "Upon receiving any communication from a claimant, regarding a claim, that reasonably suggests that a response is expected, every licensee shall immediately, but in no event more than fifteen (15) calendar days after receipt of that communication, furnish the claimant with a complete response . . . ."  Cal. Code Regs. tit. 10, § 2695.5(b).

1   claim can have an even greater detrimental effect on the insured.

2   Plaintiffs, therefore, had a duty to act promptly on defendant's

3   settlement demand because only the insurer's prompt action could

4   have protected its insured from excess liability.  <u>See also</u> <u>Betts</u>

5   <u>v. Allstate Ins. Co.</u>, 154 Cal. App. 3d 688, 707 (1984) ("[The

6   insurer's] figurative hiding its head in the sand . . . is not a

7   law-sanctioned approach to reasonable investigation and

8   performance of its duty.").

9           Lastly, while a number of the <u>Brown</u> factors to the bad

10   faith inquiry are inapplicable or offer minimal guidance under

11   the facts of this case, <u>Brown</u>'s consideration of the "failure of

12   the insurer to inform the insured of a compromise offer" further

13   underscores plaintiffs' breach of the implied covenant of good

14   faith and fair dealing.  <u>Brown v. Guarantee Ins. Co.</u>, 155 Cal.

15   App. 2d 679, 689 (1957).  Specifically, an insurer has a "duty to

16   inform the insured of reservations and settlement offers" and

17   provide the insured with "the opportunity to contribute to a

18   settlement." <u>Miller v. Elite Ins. Co.</u>, 100 Cal. App. 3d 739, 758

19   (1980).  Here, however, when Burrows realized she had received a

20   settlement offer from defendant, she declined to inform Delos

21   Santos of the settlement demand.  In fact, there is no evidence--

22   in the claim notes or in Burrows' testimony--that Burrows ever

23   contacted Delos Santos to inform her that Burrows was pursuing a

24   settlement with defendant.  As Burrows' conduct and trial

25   testimony illustrate, plaintiffs did not "give at least as much

26   consideration to the welfare of its insured as it gives to its

27   own interests." <u>Egan v. Mutual of Omaha Ins. Co.</u>, 24 Cal.3d 809,

28   818 (1979).

1        If the evidence in this case established only that a
2   generally proactive claims handler and insurer negligently missed
3   a deadline and contacted the claimant immediately upon discovery
4   of the missed deadline, as plaintiffs have argued, plaintiffs may
5   not have breached the implied covenant of good faith and fair
6   dealing.  What the evidence revealed, however, was a claims
7   handler with a practice of conscious delay that the insurer
8   condoned.  The implied covenant of good faith and fair dealing--
9   which requires insurers to make informed and prompt decisions--
10  cannot tolerate plaintiffs' conscious disregard for the
11  consequences of their intentional delay.

12       IT IS THEREFORE ORDERED that plaintiffs' request for a
13  declaratory judgment establishing that they handled defendant's
14  claim in good faith and that the policy limit remains at
15  $15,000.00 per person injured be, and the same hereby is, DENIED.

16       The Clerk is directed to enter judgment in favor of
17  defendant and against the plaintiffs in this action accordingly.
18  DATED:  June 12, 2008

20  _____
    WILLIAM B. SHUBB
21  UNITED STATES DISTRICT JUDGE

22